Last case on this morning's docket is the matter of D.M. et al. We have Joyce Randolph for the appellant. And we have Brittany Addick? Addick it? Addick is like an I. Okay. I couldn't find that K. Addick. Yeah. For the appellate. Do we have receiving Randolph? I've been having a dry mouth. Oh, they poured water for me. How about that? Anyway. Well, somebody else might have poured it and drank out of it. I don't know. I don't want to lead you astray. You can pour your own if you want. That would be a good idea, huh? Anyway, I've been having a dry mouth. The reason I want to have some water handy. Your Honors, may it please the Court. I'm here today representing Katrina H., according to the documents. Her last name is Hill. So if I happen to mention it sometime, that will be why. Katrina is the mother of nine children, or I guess you could say she was the mother of nine children, until she was determined to be unfit and her parental rights were terminated. Now, I'm assuming everybody here has read the briefs and is familiar with the facts of the law. The kids in this case, the first seven children in this case, were taken into custody in April of 2012. And there were three later born children who were also taken into protected custody after that. And the termination of parental rights proceedings happened in May of 2015, or I should say March of 2015. Now, Katrina was ordered to complete various programs as part of the conditions of learning how to better parent her children and get her children back someday. And that included domestic violence services, parenting classes, just general psychological counseling. She had to get a psychological assessment by a psychiatrist or psychologist. And anyway, there were various things that she had to do. And DCFS picked the first nine months after the children were taken into protected custody as their meter as to whether she made sufficient progress to justify perhaps getting her kids back one day. Now, that first nine months was complicated by the fact that she found herself in jail in Massachusetts County for over a month. And that threw her counseling schedule and all of these other things into disarray and she had to start all over again once she got out of jail. Now, I don't think it's argued that she purposely did anything that she knew would likely land her in jail. She just sort of found herself in a situation and that's where she found herself along with everybody else that was arrested at that time. Now, when you say she didn't do anything purposefully, she didn't go to the jail and knock on the door and say, please put me in jail. No, she didn't do that. But she was involved in an act that caused her to get arrested. Well, the explanation was that she was walking her younger brother home and all of a sudden there was some sort of to do about somebody having a weapon. Next thing you know, police are called and everybody that's in the vicinity is arrested. Now, I don't know whether you would say that she knew that walking her brother home was going to cause her to confront somebody with a weapon. I don't know. But, you know, it wasn't like she went out and took a gun and robbed a 7-Eleven or whatever they have down there. But anyway, but basically what's going on in this case is that no matter what kind of classes that she took or counseling sessions she went on or assessments that she did, the social workers in this case were convinced that she was still living or still together with her husband, Isaac Hill, who's called Ike throughout this transcript, throughout the record. And to say that Ike was antagonistic with the social workers would probably be a gross understatement. But in any case, as with any domestic violence relationship, it takes a little while for people to get the guts up to finally meet that kind of a relationship. When you say it takes a little while, didn't she end up having more children with him? Well, yes, she did. But the only proof that we can establish, she said that the relationship started to go downhill after he terminated his parental rights to the kids. He knew that she wanted to keep the kids, wanted to get the kids back. That was the beginning and the end of their relationship. However, it appears that somehow in that period of time she got pregnant and she had another child later on and was born prematurely in July of 2014. But in any event, she kept telling everybody, we're not together. We're not living together. This is me trying to get the kids back, not him, obviously. And she even went so far as to divorce him. She thought that she couldn't get a divorce because she didn't have the money to pay the filing fees and hire a lawyer. And there was another companion case to this one involving the youngest child with Judge Dahlin. And Judge Dahlin said, yes, you can get divorced. Talk to your lawyer about it. She talked to her lawyer about it, and within a month's time she was divorced from Ike. Now, what's their pattern?  Well, early on in the relationship, early on in the going back and forth with DCFS, one of the caseworkers said that she saw the two of them together in Cairo. Cairo is a very small town. Can I ask you, after one child was taken away because of the abuse by Ike, didn't he father two or three more children? Well, the first seven children, he was the father of the four youngest. I'm talking about after, I guess it was DM was removed. Yeah. He had three more children? He was the father of seven of the children altogether, seven of the ten, the seven youngest, yes. Okay. So I don't mean to belittle her efforts in trying to remove herself from an abusive situation, but she was not obviously removing herself and removing the children from an abusive situation and subjecting them to the continued treatment that initiated the removal. Well, I can agree with the record certainly says that the kids that were taken into custody would have gone back to their mother if Isaac had not been part of the package. That's true. But it still took a while for her to figure out that, you know, this is not a good relationship. She had the youngest child, as I said, was probably conceived about the time the relationship was going downhill and stayed going downhill. And by the time this termination or fitness hearing and other termination proceedings were going on, she hadn't been with him for like 15 months. As I understand, he wasn't by far the only problem with respect to her parenting. The children also testified that she beat them, didn't feed them, and didn't see there was anything wrong with him beating them. Well, I would agree with you that there was a time when she thought that it was the father's job to discipline the kids and that there was a difference between whooping a child for disciplinary reasons and beating the child. It took a while for her to figure out the difference based on her upbringing. I think Ike said that was part of his upbringing, too, was that the kids were subjected to corporal punishment. And sometimes that went beyond the pale, and most people considered that it was not their business to interfere. But anyway, so it started at the very beginning of the interaction between her and DCFS that she and Ike were still together. And then in July of 2014, one of the caseworkers came to her apartment looking for Ike, went throughout the apartment, said, well, I see some men's clothes hanging in the closet. They must be Ike's. She said, yeah, there he is. He's just never come back to get them. She found four pairs of men's shoes in the apartment at the base of the steps from the upstairs to the downstairs. Also found ashtrays of cigarette butts in her bedroom. And how all that connects to Ike, I don't know, because I don't think there's anything in the records that shows that he smoked. But in any event, she doesn't exist in a vacuum. She has friends. She has family. Those shoes and cigarette butts couldn't belong to any of those people. In that same visit, didn't the DCFS worker ask her, how can I get a hold of Ike? She said, I don't know. And then all of a sudden the next day, Ike contacts the worker? It's a small community. She's been together with him for a long time. It would not be surprising that she would know his family and his family could get a message to him. You think that the trial court could have drawn an inference that she did know how to reach him? Well, I suppose you could say that. I mean, I think that's what I hear you saying right now, that she might have talked to his sister or whatever, you know. Yes. And so when she said, I don't know how to reach him, maybe that wasn't credible. Well, she said that she did not know how to reach him personally. She did not know how to dial a number and say, Ike, somebody was here talking to you. But she could get a message to him. And it would not be a big surprise that he could get the message quickly and show up there the next day. And, you know, Ike could have all sorts of reasons for not wanting to give anybody his address if he even has one. He could be homeless, as far as anybody knows, sleeping on people's sofas and on the floor. So, but in any event, you know, he found out they wanted to talk to him, and he managed to show up there. Now, the social workers in this case also made a point of the fact that, well, some of them said that, oh, well, she didn't interact with all the kids very well. You know, she just sits there and pouts, and she doesn't bring them nutritious meals or anything like that. But there were three other professional people involved in this case who said, yeah, she tries to interact with all the kids. She's got eight or nine of them she has to try to talk to in an hour. And it's really, like I said, nothing more than long enough to say hi, bye, and here's your snack, really. So, but in any case, she tried to reach out to all of these kids as much as she could. And the other professional workers, the Addis workers, the L1 mentor worker, all those people said, you know, that she was making an effort, and she brought nutritious snacks for them, unless it was somebody's birthday or Valentine's Day, when she might have brought cupcakes or a cake or something. Okay? So in any event, I don't know what else this woman could have done to convince people that she was no longer in a relationship with Ike. It wasn't just whether or not she was in a relationship with Ike. I mean, it was her own issues and problems and inability to comprehend that there were problems with Ike and with her parenting and refusal to correct it. I think the psychologist, I don't know, but he testified it was one of the most extreme abuse cases he had been involved in. She had no remorse or understanding of her role and took no responsibility and did not want to change. He believed that she had an antisocial personality disorder. You're talking about Dr. Jean Cunningham, who I think was a woman, is a woman. Okay. And she's making these predictions about Katrina, even though she doesn't have the background information to make those speculations. And Katrina will admit she was obstinate and stubborn and everything during the first nine months that all this was going on. And that's when this psychologist evaluated her. And she thought, as I recall, Dr. Cunningham said that, I'm not sure that anything that I said could be valid because she's giving me, I think she's giving me answers that she thinks I want to hear. And I don't have the background information on her. But regardless, Dr. Cunningham came up with all this stuff about major personality disorder and antisocial personality disorder. But in the end, that's in the first nine months when, like I said, she doesn't understand why the kids have been taken away from her. She doesn't understand why they can't come home. And we just would argue to the court that Dr. Cunningham's testimony and evaluation should not carry as much weight as perhaps Your Honor is suggesting. And in any event, one of the final things I want to say about this case is that there's certainly a temptation, maybe even temptation's not really a good word, to say that Judge Silverson heard the witnesses and saw how they testified and we're going to defer to her judgment. Okay. And... Doesn't the standard of review require that we do that to some extent? This is not a de novo case. To some extent, yes. Okay. To some extent. But this is not saying that, oh, you can't ever see your kids but maybe one hour a month or one hour every six months or whatever. They're taking her kids away. I mean, it's not a matter of visitation, seeing them again. She's not going to be mom to these kids anymore. So... Well, isn't it true that that one hour visitation period only applies when the goal has been changed? When the goal is returned home, isn't it true that they have more time for visitation? I think it started out two hours twice a month. And then they changed the goal. They took these kids in to protect the custody in April of 2012. They changed the goal to pending termination of parental rights in April of 2013. Okay. So, in any event, she never had an extensive period of visitation with them. Either it was two hours twice a month, two hours once a month, to one hour once a month with eight or nine kids. Thank you, Ms. Randolph. I don't have the opportunity to do that. I just ask you. Okay. May it please the court. Joyce Whitney Atkins for the state of Illinois. The abuse and neglect of the minors in this case was horrendous. It was tortuous and it was unconscionable. But still, the mother was given a fair opportunity to acquire fitness. In that what was required of her was reasonable and feasible, but yet she still failed. And she failed tremendously. Below the state-alleged unfitness on three grounds. That she failed to make reasonable efforts to correct the conditions that were the basis for the children's removal. That she failed to make reasonable progress towards the return of the children nine months following the adjudication of abuse and neglect. And then lastly, that she failed to maintain a reasonable interest, concern, and responsibility to the welfare of the children. And this court may affirm the trial court judgment if the evidence supports any one of these bases. The trial court found in favor of the state on all three. I believe so, yes. And now the counsel for the mother. And as to the relevant time period, was that as to the first nine months? Right. For the reasonable progress prong. And then the reasonable efforts prong is the duration of the case. And then the reasonable degree of interest is also for the whole duration. And the counsel for the mother kind of conflates the first two bases. The reasonable efforts and the reasonable progress in her opening brief. But I have and I will address each bases independently. Also here in an oral argument, she also kind of conflates all the grounds. And she focuses here today on the mother's relationship with Ike. And the crux of her argument seems to be that the mother was trying. But the mother has vehemently denied an elemental condition of one of the elemental conditions of why her children were removed from her. And that is that she deprived them of food. And this was not, you know, trivial once and again deprivation of food. This was egregious. One of the children, Azarian, could barely hop on one foot when he entered into care. He grew six inches and gained 13 pounds in a few months upon entering the care of foster care. Whereas when he was with his mother, he did not grow at all for three years preceding his entry into foster care. So if the mother is unwilling to admit the existence of one of the most important conditions that is the basis for the children's removal. Then there can't possibly be any evidence that she has corrected the conditions that are the basis for their removal. And in fact, the law states that where a parent does not admit to abuse, that is sufficient for a finding, sufficient support for a finding of unfitness. Also, further support that she has not corrected the conditions that provide the basis for the children's removal, is that she minimized and denied the physical abuse that she and Ike committed. Throughout the case, multiple, numerous staff members testified that she completely denied and minimized the reason why the children were taken into custody. She says at the fitness hearing, finally, that her children were abused. But that was the only evidence that she acknowledged that the abuse occurred, was her self-serving fitness hearing testimony. And so the court was absolutely entitled to be persuaded by the numerous testimonies of the other staff members, and not of the mother's one-time fitness hearing testimony. Further evidence that she did not correct the conditions are that she did not redress her failure to protect her children. Throughout the case, she continued to expose her children to Isaac Hill, showing them photographs, putting them on the phone with him, threatening them that they were going to come home to him and her, dropping the children's order of protection against Isaac. And then there was, of course, the evidence that just, you know, nine, eight months prior to the fitness hearing, she was with Isaac Hill. And the mother claims that the state can't prove that, you know, eight months, nine months prior to the fitness hearing, she was with Isaac Hill. But there is evidence showing that she was, as your honors have already touched on before, you know, the finding of his clothing at her home and being able to contact him promptly. This was all evidence that they were still in relationship, and the trial court was entitled to be persuaded by that evidence. But even if, you know, she did cease to be in a relationship with him at that point, there was still strong evidence that she had this proclivity to expose her children to him, to continue to expose her children to him, and to continue a relationship with him. Now, turning to her failure to make reasonable progress towards the return of the children within nine months after the adjudication of abuse and neglect, the benchmark for measuring that is the parent's compliance with service plans. That's very easy to support. The caseworker, Mary Seals, that was the family's caseworker for the first nine months, never rated the mother satisfactory in complying with any of the service plans and stated that the mother did not make reasonable progress towards the return of her children. So there you have it, noncompliance with service plans. The respondent counters that. She is excused from this noncompliance because she was incarcerated during those nine months, a portion of those nine months, but the law indicates that this is just non-excuse. And further, one of the reasons why she was rated unsatisfactory, at least to the domestic violence, was because she reconciled with Isaac. So the noncompliance didn't rest solely on her incarceration. And furthermore, her failure to admit the abuse and neglect, the law states that this, too, is a sufficient basis to conclude that a parent has not made reasonable progress. Finally, to the last basis, the mother's failure to make, to have reasonable concern and interest and responsibility in the children's welfare. Again, the mother's failure to admit the abuse and neglect, her exposure of the children to Isaac, dropping the order of protection, her failure to comply with the service plans, that is all ample and sufficient evidence that she did not make, did not have, take reasonable interest and concern and responsibility to the welfare of her children. And so for these reasons, the state asks that you affirm the trial court's judgment terminating Petrina H.'s parental rights as to her nine children. Thank you, Ms. Atkins. Ms. Randolph? One of the things that I have noticed in working in these cases is that when something happens once during some kind of visitation or whatever, the DCFS is very quick to make it sound like it happens at every visit or it happens all the time. Now, my client says that she never used her phone to let the kids talk to Ike, and that one of the kids was playing with her phone one day and saw pictures of Ike on the phone. And then what they're talking about with regard to her giving up the order of protection with regard to the kids, well, at that time DCFS was talking about both of them, Ike and Petrina, receiving services so that they could get visitation with the kids and hopefully be reunified with the kids. And it seemed to her at the time that if they're doing all that and they're pursuing reunification of the family, what's the point of this order of protection? Now, admittedly, she probably should have asked somebody's advice before she did that, but that was her reasoning at the time. And now Ms. Atkins was also talking about the third prong of the finding of unfitness, that there was noncompliance with the service plans. Well, and that her being in jail is not an excuse for that, for her not complying or starting to comply within the first nine months. Well, it's not an excuse. It's just something that happened that explains why she has to get started all over again. And again, you know, what we're talking about, we're talking about subjective evaluation when you talk about her not complying with the service plans. Because I believe Mary Seals, or maybe it was Madonna Spann, said that, well, okay, she might have completed that counseling program or that anger management program or domestic violence program, but that doesn't mean anything because I don't think she learned anything from it. Well, that's her subjective evaluation at that point. A lot of this is subjective evaluation by DCFS. And I don't think anybody can argue that there is not evidence of hostility between my client and Madonna Spann and Mary Seals at one time. And I'm not saying that that's the driving force behind this whole thing, but it's certainly something to be considered when you're talking about her noncompliance with the service plans. Are there any more questions? All right. We would ask that your honors reverse Judge Saldus' decision and remand her for the proceedings. And Chief Randolph, consenting? We'll take the matter under advisement for the ruling in due course. We stand in recess until 1 o'clock. All rise.